TD's Western Wear and Tack, LLC, class plaintiff,
as well as all other similar situated individuals,

     Plaintiffs,

        v.                          Civil Action No.:
                                      JURY DEMANDED

KNOX COUNTY, and KNOX COUNTY
MAYOR GLENN JACOBS,

     Defendants.

## **COMPLAINT**

     NOW COME Plaintiffs, by and through their attorneys, THE EGLI LAW FIRM and the

LAW OFFICES OF DARREN V. BERG, who hereby bring this action for declaratory and

injunctive relief, and also seek the Court's approval of a limited fund class action on behalf of all

similarly situated businesses in Knox County and seeking as part of the same monetary damages

for the entire class for Plaintiff and all similarly situated businesses, against KNOX COUNTY

and KNOX COUNTY MAYOR GLENN JACOBS, in his official capacity as the Mayor of

Knox County (hereafter referred to as "Defendants"). This cause of action is based on the Order

of the Knox County Mayor, based on the Covid-19 disease, wherein his Order blatantly violates

the constitutional rights of business owners in the County as will be explained more fully herein,

infra. In support of its claim, Plaintiff states the following:

## **PARTIES**

1.     Plaintiff, TD's Western Wear and Tack, LLC, is a Tennessee limited liability company

and has its principal place of business located in Knox County Tennessee. Plaintiff is a clothing

store focusing on western theme clothing.

1

2. Defendant Knox County is a duly organized County pursuant to the laws of the State of Tennessee and can be served with process through its chief executive officer, Defendant Mayor Glen Jacobs.

3. Defendant Glenn Jacobs is the Knox County Chief Executive Officer who issued the facially unconstitutional order to shut down businesses such as the lead class Plaintiff noted herein.

## JURISDICTION AND VENUE

4. This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331, 1343(a)(3)- (4), which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights and privileges under the United States Constitution. This complaint is brought as a class action lawsuit pursuant to the limited fund doctrine.

5. This action is brought by Plaintiffs seek relief under 28 U.S.C. §§ 2201-2202, 42 U.S.C. §§ 1983 et seq., and the Fourteenth Amendments. See U.S. Const. Am. XIV.

6. Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## INTRODUCTION AND SUMMARY OF THE CLAIMS PRESENTED

7. Plaintiff is a Western Wear clothing store doing business in Knox County, Tennessee. Plaintiff's business, and all others similarly situated to it, were affected businesses ordered to shut down by way of the Knox County Mayor's Order. A copy of the Order is attached hereto as **Exhibit A**. The Order blatantly violates the Due Process rights and fundamental constitutional rights of Plaintiff and all similarly situated businesses.

8. "The Fifth Amendment guarantees that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960).

2

9.     Furthermore, the Due Process Clause of the Fourteenth Amendment, applicable to the Defendants herein--who at all times material hereto were acting under color of state law-- guarantees Plaintiff the right to be free from the deprivation of its liberty and property interests without Due Process of law.

10.    Due Process has two separate prongs:  substantive Due Process and procedural Due Process.

11.    Procedural Due Process requires fair notice and fair hearing; whereas substantive Due Process challenges the very nature of the government's actions and laws.

12.    Clearly, Plaintiff, and all similarly situated businesses were not provided fair notice of the shutdown Order before it occurred; neither have they been afforded a fair hearing to challenge the same.

13.    More problematic, however, is the fact that the Order itself violates substantive Due Process in a fundamental way never before authorized by the Supreme Court of the United States.

14.    In the absence of the declaration of martial law, neither the President of the United States, nor any other executive at the State, County or City level of these United States can suspend constitutional rights of citizens based upon their tyrannically-based belief that the vitiation of those rights is needed at the time.  See Ex parte Millgan, 71 U.S. 2 (1866).[1]

15.    In considering the individual liberties guaranteed to the citizens of this realm as set forth in the Constitution of these United States, a rightful respect for the the views held by our founders, as to the issue at hand, would seem quite appropriate:

    (a)     "Those who would give up essential liberty to obtain a little temporary safety, deserve neither liberty nor safety." -- Benjamin Franklin, 1775.

---

[1] Unless the underlying emergency is one of invasion or rebellion.  In such an instance, Congress could also pass a law suspending constitutional rights.  No Congress has ever passed such a law.  In any event, in the absence of a congressionally-passed law based on invasion or rebellion or the declaration of martial law by the President, the writ of habeas corpus (and all other constitutional rights) cannot be suspended, vitiated or ignored.

(b)     Upon exiting the Constitutional Convention, Benjamin Franklin was asked by a group of citizens what form of government had been created.  In response, Mr. Franklin stated, "A republic, if you can keep it." -- Benjamin Franklin, 1787.  A republic differs materially in form of government from almost all other forms of government in that it is organized to protect the liberty interests of regions, and the inhabitants thereof, over those of the mass-population centers, and the inhabitants thereof.  See, e.g., The Pre-Caesarian Roman Republic; see also Brabham, Francis, The Political Works of Marcus Tullius Cicero Comparing his Treatise on the Republic and his Treatise on the Laws, (Spettigue 1841).  A unique and constitutionally-protected portion of our experiment in republicanism, see, e.g., the multiple times the loser of the popular vote has won the Presidency of the United States; c.f. U.S. Const., Art. 1, § 2, is the fact that the rights of the region (States) and the individual cannot be usurped by any executive officer's musings of the moment.  The entire purpose of the Bill of Rights (mandated for inclusion in the Constitution by the anti-federalists), was to ensure the rights of the individual.  See U.S. Const., ams. I, II, III, IV, V, VI, VII, VII and IX.  These rights, as noted by Jefferson, and John Locke before him, do not originate from GOVERNMENT.   See Jefferson, Thomas, Adams, John, Franklin, Benjamin, The Unanimous Declaration of these United States of America, (Maltack, Timothy, Philadelphia, Penn., 1776) ("We hold these truths to be self-evident, that all men are created equal, that they are endowed ***by their Creator*** with certain unalienable rights, that among these are life, liberty and the pursuit of happiness.") (emphasis added).  If these fundamental rights do not originate from government (man), they cannot be taken away by government (man), in the absence of very long and well-established bases for the alienation of such rights such as criminal conviction.  Any suggestion to the contrary by these Defendants and our federal and state superiors, supreme beings, betters, overlords, controllers, and tyrants, constitutes nothing less than an express repudiation of the founding principles of this Republic--notwithstanding the emergency of the moment:  an **alleged** virulent strain of the flu (as if that hasn't happened

before!).   It is readily apparent our founders were well aware of the plague.  See "Yellow fever breaks out in Philadelphia" in 1793 (History.com last checked Apr. 24, 2020).[2] Yet, they somehow--albeit acting pursuant to deeply-held beliefs, a concept seemingly utterly alienated to those of our current federal, state and local masters--failed to set forth any provisions in our primary law allowing the suspension of constitutional liberties and freedoms, absent rebellion or invasion.  It is without question our founders certainly knew of the plague before 1793, but, to the extent the Defendants herein demand strict proof thereof, Plaintiff would refer them to their currently-shut-down libraries, where ample volumes will help to illuminate them in this regard. More importantly, if our framers deemed an outbreak of a virulent strain of the flu to be of such critical importance to justify the suspension and alienation of the constitutional rights and liberties of all American citizens, they easily could have amended the federal constitution to ensure tyranny could prevail, and individual rights could cease to exist, for the then-existing national emergency of whatever degree, novelty, or proportion our then-existing better-doers decide exists to justify quarantining the plebes!  These actions are so far afield from acceptable constitutional practice and jurisprudence to be, in the absence of the national media horde proclaiming the impending utter demise of Western Civilization unless we all "shelter in place" "until a vaccine is approved," an affront to any organized system of liberty--let alone ours.

(c)      Thomas Jefferson, the primary drafter of the Declaration of Independence, and one of our most important founders, stated as follows:'

> The people can not be all, and always, well informed. The part which is wrong will be discontented in proportion to the importance of the facts they misconceive. If they remain quiet under such misconceptions it is a lethargy, the forerunner of death to the public liberty. We have had 13 states independent 11 years. There has been one rebellion. That comes to one rebellion in a century and a half for each state. What country before ever existed a century and half without a rebellion? And what country can preserve its liberties if their rulers are not warned from time to time that their people preserve the spirit of resistance? Let them take arms. The remedy is to set them right as to facts, pardon and pacify them. What signify a few lives lost in a century or two? The tree of liberty must be refreshed from time to time with the blood of patriots and tyrants. It is its natural manure.

---

[2] Other strains of the plague existed prior to 1793 in the early-American and colonial experience.

Letter from Thomas Jefferson to William Stephens Smith, 1787.

(d)　　In Federalist Paper No. 51, James Madison explained,

> The interest of the man must be connected with the constitutional rights of the place. It may be a reflection on human nature, that such devices should be necessary to control the abuses of government. But what is government itself, but the greatest of all reflections on human nature? If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself.
>
> ....
>
> Justice is the end of government. It is the end of civil society. It ever has been and ever will be pursued until it be obtained, or until liberty be lost in the pursuit.

Federalist Paper No. 51, James Madison, 1788.

(e)　　Indeed, Article 1, Section 9, Clause 2 of the United States Constitution, as made applicable to these Defendants by the Due Process Clause of the Fourteenth Amendment, sets forth some rather interesting language, which our tyrannical do-gooders and self-proclaimed know-it-all elected officials and overseers seem to ignore, perhaps with impunity until the initiation of this action:'

> The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.

U.S. Const., Art. 9, § 2 (1787; ratified 1789).

If the Writ of Habeas Corpus "shall not be suspended," except in cases of "rebellion or invasion" then quite obviously, the remainder of the Constitution's individual protections and rights cannot either, save for well-established, and long-existing authority relating to the suspension of those rights for individuals convicted of crimes and or of those who are sick with some disease pursuant to public health epidemics or pandemics where the State's authority to quarantine the SICK--but  not the HEALTHY--has been long recognized.

(f)　　"Give me liberty or give me death!" - Patrick Henry, 1775.

16.　　Although legal precedent exists for an executive, as noted hereinbefore, to order a person

who is sick with a disease to quarantine, no precedent exists, whatsoever, to allow an executive to

issue an order, mandating under penalty of law that non-sick persons shelter in place or to close

businesses--wherein no proof exists that said business is causing or contributing to the spread of such disease other than the mere presence of its customers and employees.

17.     In addition, the Defendants' Order itself is abjectly ridiculous, not based on any science whatsoever--as to which businesses are "essential" and allowed to remain open and which businesses are "non-essential" and required to close.

18.     For just one example, and others will be set forth herein, the County Mayor's Order, deems as essential liquor stores (which sell cigars), but deems as non-essential cigar stores (which sell alcohol).  Only a bureaucrat could conceive such utter inanity.

19.     Additionally, the Order in question is arbitrary and capricious (if rational basis is applied) and not narrowly tailored to promote a compelling governmental interest (if strict scrutiny is applied).

20.     The Constitution of the United States does not cease to exist at the desk of any executive from the President, to the Governor, to these Defendants.

21.     These Defendants' actions cannot stand unless this Court were to suspend the rights of the Plaintiff, and all other similarly situated businesses, based on the flu!  Utter nonsense!

## **FACTS**

22.     The World Health Organization ("WHO") and the Center for Disease Control and Prevention ("CDC") identified the novel coronavirus ("COVID-19") as a "public health emergency of international concern."

23.     Likewise, the U.S. Department of Health and Human Services ("HHS") declared that COVID-19 has created a public health emergency.

24.     On March 23, 2020, Mayor Glenn Jacobs, proclaimed the existence of a state of emergency throughout the County of Knoxville known as the "Knox County Safer at Home Order." **Exhibit A.** In said Order Mayor Glenn Jacobs urged Knox Countians to stay at home, prohibited all gatherings of ten or more people, including, but not limited to, community, civic,

public, leisure, faith-based (churches), sporting events, parades, concerts, festivals, conventions, fundraisers and similar activity. The Order goes on further to close all businesses to the public which were not performing essential services and included, but was not limited to, hospitality, educational, and entertainment businesses and facilities, nail, massage, tattoo, tanning, waxing, and other such facilities, and public and private social clubs. The Order also prohibited Plaintiff's business, and all others similarly situated, from allowing customers to come into the store. **This Order remains in effect as of the filing of this Complaint.**

25.     Mayor Jacobs Order made no distinction between sick people or people who may have been diagnosed with Covid 19 but rather applied to all people and businesses living and doing business in Knox County, Tennessee.

## BUSINESS RESTRICTIONS UNDER THE ORDER AT ISSUE HEREIN

26.     Under the Order at issue herein, Defendants mandated the shutdown of all business not deemed essential. In the orders "essential" means hospitals, grocery stores (that also sell clothes, such as Krogers, Sam's Club, Costco, Wal-Mart, Target, etc.), beverage stores (read liquor stores as they have never closed) gas stations, hotels, parks and banks.

27.     Any business operating out of compliance with the Order herein is subject to the possibility of severe fines and penalties.

28.     Notably absent from the executive orders issued by Defendants is any provision addressing the inherent financial burden inflicted by the Order on individuals and businesses throughout Tennessee as a direct result of the mandated shutdowns.

29.     Under the Order herein, businesses such as the Plaintiff's, which could have safely operated while still observing social distancing, have been ordered to close (or not allow customers in the business thereby all but closing them down by way of governmental tyranny and express, intended and utterly incomprehensible ignorance or open repudiation of the Constitution of the United States.

30.     Plaintiff's business is not categorized as an "essential" business that is permitted to stay open when Defendants ordered several categories of businesses to close for the stated public purpose of controlling COVID-19 to protect public health.

31.     Plaintiff, and all other similarly situated businesses, have suffered irreparable injuries as a result of the Defendants' Order.

32.     Plaintiff, and all other similarly situated businesses, have now been closed by Defendants' unconstitutional Order since March 23.  Many of the putative class Plaintiffs will never be able to re-open as the Defendants have decided to select the winners and losers in business.

33.     For example, a liquor store can remain open and sell cigars, but a cigar store (that sells alcohol) cannot.  This Order is so utterly devoid of logic as to beg the question of whether an adult is actually in charge.

34.     Further, Wal-Mart (deemed essential) is allowed to remain open and sell clothing products, but Plaintiff, and all other similarly situated businesses, were ordered to close their doors to the public.  Clearly, the Mayor and County are not allowed to pick winners and losers between businesses.   It boggles the mind that a lawsuit even has to be filed to re-enforce the constitutional rights of Tennesseans.  But, one clearly does, as the Mayor and County have not rescinded this Order.

35.     With the forced closures, Defendants caused considerable damage to Plaintiff, and all other similarly situated businesses, to their reputations, relationships with customers, vendors and employees, and as to their profits.

36.     The Defendants actions have resulted in massive, and in most cases, irreversible losses that are in dire need of an immediate Order, enjoining the Defendants from any continuation of their unconstitutional Order.

37.      As previously noted, the Order challenged herein makes it commercially impracticable to use the property belonging to Plaintiff, and other similarly situated businesses, for any

economically beneficial purpose and inflicts very nearly the same effect for constitutional purposes as appropriating or destroying [the property as a whole]. *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 455, (2009), or, in the alternative, it constitutes a taking under the Fifth Amendment to the United States Constitution made applicable to Tennessee by the Fourteenth Amendment's Due Process Clause.

38.     The property of Plaintiffs, which Defendants rendered unusable, includes both the real property in which the business is physically located ("Physical Location") and the tangible property housed in such locations – such as machinery, inventory, tools, business records, and other forms of tangible equipment used in operating each business ("Tangible Property") (both forms of property collectively referred to as "Property").

39.     Despite issuing the Order for a readily-apparent public purpose, Defendants did not provide compensation for those who suffered substantial – and perhaps total – diminution of value in their property interests as a result. These Orders by their operative provisions deprived Plaintiffs of all economically beneficial use of its Property.  See, e.g., U.S. Const. am. V; see also U.S. Const. am. XIV.

40.     As noted, this Orders constitutes a regulatory taking implemented for a recognized public purpose, and therefore the failure to pay just compensation contravenes the Takings Clause of the Fifth and Fourteenth Amendments. See Coalition for Gov't Procurement v. Fed. Prison Indus., 365 F.3d 435, 478, (2004); see also  Horne v. Dep't of Agric., 576 U.S. 350, 135 S. Ct. 2419, 2426 (2015) ("Nothing in the text or history of the Takings Clause, or our precedents, suggests that the rule is any different when it comes to appropriation of personal property. The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home.").

## AUTHORITY

41.    Mayor Glenn Jacobs claimed his authority to enact the Orders by citing a set of broad emergency statutes which were said to authorize their actions to stem the spread of COVID-19 across the State of Tennessee, County of Knox and City of Knoxville.

42.    This suit accepts as fact that Governor Bill Lee and Mayors Indya Kincannon and Jacobs took action for a public purpose. As stated in the preamble to the executive orders, "the World Health Organization and the Centers for Disease Control and Prevention ("CDC") have declared [COVID-19] a 'public health emergency of international concern,' and the U.S. Department of Health and Human Services ("HHS") Secretary has declared that COVID-19 creates a public health emergency."

43.    However, Defendant Jacobs' Order is arbitrary and capricious in that it allows liquor Stores (that sell tobacco) to remain open but closes tobacco stores (that sell alcohol). Indeed, only a government bureaucrat, selecting winners and losers based on consideration of campaign contributions, industry trade groups, lobbyists' arguments and the like could ever formulate such a ridiculous, non-scientific based Order. In addition, any business deemed essential can sell clothes; Plaintiff, and all other similarly situated businesses cannot allow customers into their clothing stores. The Defendant's Order makes no logical sense whatsoever and does not therefore pass the rational-basis-test let alone strict scrutiny review.

44.    In addition, in closing all of the stores, deemed non-essential, the Order has resulted in the massive increase in in-person shopping at stores like Wal-Mart, Costco, Krogers, Food City, etc. Upon information and belief, if the purpose of the Order is to halt the spread of the Covid 19 virus, it appears as if the Defendant's Order is primarily designated to promote the spread: herd all members of the community into a few designated businesses. Utterly, incomprehensible! As noted, the Defendant's Order, makes no logical sense whatsoever and does not therefore pass the rational-basis-test let alone strict scrutiny review.

45.    Notwithstanding any legitimate public purpose, the Defendants' Orders halted all economic activity and violates the fundamental rights of Plaintiff and all businesses similarly situated as protected by the Constitution of the United States and the Constitution of the State of Tennessee.

## COUNT I

## VIOLATION OF THE TAKINGS CLAUSE—42 U.S.C. §1983

### The Order herein is an unconstitutional regulatory taking of property without just compensation in violation of the fifth amendment's takings clause as incorporated under the fourteenth amendment

46.    Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

47.    Defendants seized without compensation the property of the Plaintiff and all similarly situated businesses by forcing the closures of said businesses under the Order challenged herein.

48.    These uncompensated seizures violate the Takings Clause of the Fifth Amendment, made applicable to States through the Fourteenth Amendment, and also violate well-established notions of Substantive and Procedural Due Process. Plaintiffs respectfully request that this Court (i) declare the Defendants' actions unconstitutional, and (ii) order the payment of just compensation.

49.    Defendants issued an Executive Order for the public purpose of protecting the public health, safety and welfare.

50.    Defendants have placed the cost of this Order – issued for the benefit of the public – squarely upon the shoulders of private individuals, businesses and their families and have failed to justly compensate affected parties for these takings undertaken for their benefit to the public.

51.     Without extending constitutionally required just compensation to Plaintiffs, these Orders jeopardize the sustainability of Plaintiff's business, and all others similarly situated, and the rights of the same with respect to property ownership.

52.     As previously noted, the Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. am. V.

53.     The Takings Clause "is designed not to limit the governmental interference with property rights *per se,* but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536–37 (2005) (quoting *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 315 (1987) (emphasis in original)).

54.     The Takings Clause bars government actors "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49 (1960).

55.     Defendants issued the Order herein as a means of slowing the spread of the novel coronavirus.

56.     Defendants acted under color of state law, and the Orders herein were issued to serve a well-recognized public purpose by a duly elected County official and his designees.

57.     These Orders adversely impacted Plaintiff, and all others similarly situated,  and their use of their Tangible Property and Physical Locations to such an extent that, at least temporarily, the Orders entirely diminished the economically beneficial use of those Properties.

58.     Under the challenged Order, it eliminates, for all practical purposes, *all* economically beneficial and profitable uses of the Tangible Property and Physical Location and the benefit of the Property; save bare ownership.

59.     The Order requires non-essential businesses to remain idle.

60.     The Supreme Court "recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster— and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Lingle*, 544 U.S. at 37.

61.     "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415–16 (1922).

62.     The Defendants' executive Orders "go too far" and must "be recognized as a taking." *See id*.

63.     Otherwise, without just compensation guaranteed by the Takings Clause, Plaintiffs will be privately saddled with the cost of paying for government action undertaken for the common good.

64.     Plaintiff, and all similarly situated businesses,  have been called upon to sacrifice all usage of their Properties in the name of the common good, that is, to leave their properties economically and otherwise idle, and for this, they have suffered a taking. *Lucas*, 505 U.S. at 1019.

65.     In the alternative, under the framework articulated by the Supreme Court in *Penn Central*, these Orders constitutes a taking based upon "the magnitude of [the Orders'] economic impact and the degree to which [the Orders] interfere[] with legitimate property interests." *Lingle*, 544 U.S. 528 at 540.

66.     The Supreme Court's analysis in *Penn Central* sets forth the framework for assessing whether government action is considered a regulatory taking, identifying "several factors that have particular significance." *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124 (1978).

67.    The court looks to three factors when analyzing a taking: (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action," *Penn Cent.,* 438 U.S. at 124, 98 S.Ct. 2646. While these factors provide "important guideposts," "[t]he Takings Clause requires careful examination and weighing of all the relevant circumstances." *Palazzolo,* 533 U.S. at 634, 636, 121 S.Ct. 2448 (O'Connor, J., concurring); *see also Tahoe–Sierra,* 535 U.S. at 321, 122 S.Ct. 1465 (whether a taking has occurred "depends upon the particular circumstances of the case"); *Yee v. City of Escondido,* 503 U.S. 519, 523, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (regulatory takings claims "entail[ ] complex factual assessments"). *Lost Tree Vill. Corp. v. United States*, 115 Fed. Cl. 219, 228 (2014) (emphasis added).

68.    Even if the regulation falls short of eliminating all economically beneficial use, a taking nonetheless may have occurred, *Palazzolo v. Rhode Island,* 533 U.S. 606 at 617, (2001).

69.    Since the onset of Defendants' Order, Plaintiff, and all similarly situated businesses, have not been permitted to use their Physical Locations to operate their businesses, nor have they been allowed to use their Tangible Property for any economically profitable use--save some ridiculous notion that their clients can call in an Order and they can take it outside.

70.    Given the foregoing, the Plaintiff, and all similarly situated business, would sue the Defendants and seek this Court's approval of a class based on the limited fund doctrine based on the Order constituting a regulatory taking.

## **Count II**

## **SUBSTANTIVE DUE PROCESS—42 U.S.C. §1983**

## **INTERFERENCE WITH LIBERTY AND PROPERTY INTERESTS**

### **2020-21 and 2020-42 A Class Action Claim to Deprive Plaintiff, and all Similarly Situated Businesses, of their Rights to Liberty and/or Property without Due  Process of Law in Violation of the Fourteenth Amendment**

71.     Plaintiffs hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

72.     Never in the history of the United States – even in war time – has any governmental entity, such as these Defendants, created laws and/or issued executive orders, such as the challenged Order herein, vitiating the constitutional rights of  "all" citizens, and businesses, on a state and/or national basis as has occurred by the issuance of the challenged Order and the orders of the Governor of this State. The two potential exceptions to this statement resulted in the Supreme Court's reversal of President Lincoln's suspension of the writ of habeaus corpus for southern sympathizers, *Ex Parte Milligan*, *see*, *supra*, and on the Supreme Court's affirmance of President Roosevelt's Order, quarantining (or placing into detention) American citizens of Japanese descent, *Korematsu v. United States*, 323 U.S. 214 (1944) (challenging President Roosevelt's executive Order 9066 of February, 1942).  As cannot seriously be argued, *Korematsu* had for generations come into substantial disfavor and criticism by leading constitutional scholars, and it was recently given its proper place in the ash heap of history alongside *Dred Scott v. Sandford*, 60 U.S. 393 (1856), *overruled by* U.S. Const. am. XIII, and *Plessy v. Ferguson*, 163 U.S. 537 (1896), *overruled by Brown v. Board of Education*, 347 U.S. 483 (1954).  S*ee Trump v. Hawaii*, 585 U.S. ____, 138 S. Ct. 2392 (2018) (Roberts, C.J.) ("The dissent's reference to *Korematsu*, however, affords this Court the opportunity to make express what is already obvious: *Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—'has no place in law under the Constitution.'").  Notwithstanding those abhorrent decisions--ultimately corrected by the chief arbiter of the meaning and application of our primary law to the citizens of this realm, neither *Dred Scott* nor *Korematsu* so much as attempted to ignore, suspend or vitiate the constitutionally-protected rights in question to all citizens (*Dred Scott*--only to slaves; *Korematsu*--only to citizens of Japanese descent).  As such, this Order is even more constitutionally repugnant than those abominations!  To be clear, the Order challenged herein is more of an affront to the principles of individual liberty enshrined in the Declaration of Independence and as set forth thereafter in the United

States Constitution and the Bill of Rights than either of the decisions in *Dred Scott* or *Korematsu*. This Order cannot stand if we are to retain our well-earned reputation as a nation governed by laws and not men. If the people through their elected representatives and executives wish to amend the constitution so as to suspend constitutional rights when a virulent flu occurs, then they may do so. However, unless and until they do, this Order, and all others like it, must be struck, and compensation based on the same must be paid, or we no longer have kept our republic. We will have simply given nurture and succor to Franklin's dire apocalyptic warning that if we were ever to trade liberty for safety, we are entitled to neither.

73. The Plaintiff, and all similarly situated businesses, has a protected liberty interest in their right to live without arbitrary governmental interference in their fundamental property right to use and enjoy land in which they hold a recognized interest. *See MFS, Inc. v. DiLazaro,* 771 F. Supp. 2d 382, 440–41 (E.D. Pa. 2011) (*citing DeBlasio v. Zoning Bd. of Adjustment for Twp. of W. Amwell,* 53 F.3d 592, 600 (3d Cir.1995)); *see also Horne*, 576 U.S. 350, 135 S. Ct. at 2426.

74. The Supreme Court "ha[s] emphasized time and again that "[t]he touchstone of due process is protection of the individual against arbitrary action of government[.]" *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (quoting *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974)).

75. Governmental liability and "fault [may] lie[] in a denial of fundamental procedural fairness … or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective[.]" *Id*. at 845-846 (citations omitted).

76. "'[S]ubstantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' ... or interferes with rights 'implicit in the concept of ordered liberty[.]'" *United States v. Salerno,* 481 U.S. 739, 746 (1987) (quoting *Rochin v.California,* 342 U.S. 165, 172 (1952), and *Palko v. Connecticut,* 302 U.S. 319, 325–326 (1937)).

77.     "[T]he substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Lewis*, 523 U.S. at 847 (quotations omitted).

78.     These Orders as set forth above, constitute arbitrary, capricious, irrational and abusive conduct which unlawfully interferes with Plaintiffs' liberty and property interests protected by the due process clause of the Fourteenth Amendment to the United States Constitution.

79.     Defendants have acted under color of state law with the intent to unlawfully deprive the Plaintiffs of their liberty and property without substantive or procedural due process in violation of the Fourteenth Amendment to the United States Constitution.

80.     Defendants' actions, including issuance and enforcement of these Orders, constitute the official policy, custom, and practices of Knox County, and because they were issued at the executive level, said Orders constitute the official custom, policy and procedures of said County.

81.     These Orders intrude upon the Plaintiff, and other similarly situated business's, use and enjoyment of their property and separately impacts upon the use of its Tangible Property. *See DeBlasio,* 53 F.3d at 601. Therefore, Defendants' have violated Plaintiff, and other similarly situated businesses's substantive and procedural due process rights. *See also Nashville, C. & St. L. Ry. v. Walters*, 294 U.S. 405, 415 (1935).

82.     Defendants' have arbitrarily, irrationally and capriciously imposed upon Plaintiff, and other similarly situated businesses, use and enjoyment of their property by, *inter alia*, requiring them to both shutdown indefinitely and to privately bear the burden for such publicly beneficial decisions, which are aimed at slowing the spread of the novel coronavirus. *See DeBlasio,* 53 F.3d at 601.

83.     The Defendants intentionally and with malice aforethought, and with no scientific and or medical bases to support their nonsensical, and unconstitutional Orders, issued said Orders in express violation of substantive and procedural due process.

84.     Defendants allegedly, and without sufficient scientific or medical bases to support the same, implemented these Orders for the purpose of preserving public health, safety and welfare. The implementation of these Orders, however, caused Plaintiff, and other similarly situated businesses, harm which they are being asked to privately bear for an amorphous, at best, and alleged, but denied, public benefit.

85.     The Defendants' behavior does not comport with traditional ideas of fair play and decency, *Breithaupt v. Abram,* 352 U.S. 432, 435 (1957), and shocks the conscience' and violates the 'decencies of civilized conduct.'" *See Lewis*, 523 U.S. 833, 846–47 (citations omitted); and violates Plaintiff's, and all similarly situated businesses, Substantive and Procedural Due Process Rights.

86.     Defendants have acted intentionally, willfully, wantonly, and with callous and reckless disregard for Plaintiff's, and all similarly situated businesses constitutional rights.

87.     In the absence of a declaration of martial law, no governmental entity in this nation may vitiate the constitutional rights of its citizens. *See Ex Parte Milligan, supra; accord Trump*, 585 U.S. ___, 138 S. Ct. 2392, *overruling Korematsu*, 323 U.S. 214.   Perhaps unbeknownst to foreign tyrants, the President of these United States, the Governor of the State of Tennessee, and these Defendants, the constitutional rights of Tennesseans--who, arguably, more than any other citizens of this realm have been  responsible for the protection of the same (the Volunteer State is not named because Tennesseans volunteered for football; it is because we volunteered to fight and die for those words Mr. Jefferson wrote and the principles in the Constitution that followed)--actually STILL APPLY during a virulent QUASI-FLU PANDEMIC.  If the government wishes to vitiate such rights legally, it simply needs to amend the Constitution of the United States and insert a "your-rights-cease-when-the-flu-becomes-a-public-problem-that-we-deem-sufficiently-important" clause as an amendment to our constitution.  In the meantime, these authorities' actions constitute nothing less than tyranny!  If it were not for the existence of a tri-partite form of government, these actions would go unchallenged!  Unfortunately for these Defendants and their tyrannical comrades,

this Court holds the ultimate authority to determine whether their Orders comply with the primary law of this realm.

88. As a direct and proximate result of Defendants' Executive Orders, Plaintiff, and all similarly situated businesses, have and will continue to sustain, monetary damages including loss in the value of the Tangible Property and Physical Locations, lost revenues, profits, expenses, attorneys' fees, and other costs incurred.

89. Plaintiff, and all other similarly situated businesses, therefore sue the Defendants for violating their rights secured by the Constitution, Treaties and Laws of the United States and seek money damages for each putative class member.

90. Plaintiff also seeks class certification based on the limited fund class action doctrine as these Defendants do not possibly have sufficient funds to satisfy these claims which may well exceed $1,000,000,000.00

91. Finally, the proper standard of review (strict scrutiny, intermediate scrutiny or rational basis) is somewhat unknown as no executive save Lincoln during the Civil War, *Ex parte Millgan* and Roosevelt during the Second World War, *Korematsu*, has ever attempted to vitiate the constitutional rights of ALL citizens which is the basis for the facial invalidity of the challenged Order. And both President Lincoln and Roosevelt's actions were repudiated by the United States Supreme Court, the ultimate authority in this realm to determine whether executive actions comport with our primary law: the United States Constitution. *See* *id.*; *see also* *Marbury v. Madison*, 5 U.S. 137 (1803)

92. In any event, clearly the rights at issue are fundamental rights and this Court should therefore employ strict scrutiny to review them. When applying strict scrutiny, this Court has no choice but to conclude that the challenged Orders are facially void in violation of substantive Due Process as the challenged Order is not sufficiently narrowly tailored to promote the government's alleged compelling interest. Therefore, under strict scrutiny, these utterly incomprehensible

Orders, from a scientific and medical basis, must be struck down as unconstitutional. In so doing, the Court must hold the Orders in question to be facially void!

93. In the alternative, the Orders in question are utterly nonsensical: a liquor store is deemed essential (which sells cigars), but a cigar store which sells alcohol is deemed non-essential (and therefore shut down). In addition, a western wear clothing store is deemed non-essential, but a major retailer which sells clothes who is deemed essential (Costco, WalMart, etc.) is open and can sell clothes. And, the Orders herd the members of the public into only a few, governmentally-approved stores, thereby promoting to a spread of the virus, not a prevention of the same! One literally could not conceive of this idiocy; if this is not the very definition of tyranny, what is? IN any event, no basis exists for these designations of essential versus non-essential, and therefore the Order must also succumb to federal constitutional review under the rational basis test as rationality has eluded executive authorities across these United States, including the Defendants herein.

94. Finally, these Defendants' actions resulted in the government picking the winners and losers in business in violation of Due Process of law under the Fourteenth Amendment. The government is not allowed to pick winners and losers. In this case, it chose Costco and WalMart over the Plaintiff, but it never had the authority to do so and now its actions must be repudiated, and it must be made to pay, and pay, and pay and pay, as it does not have enough money in its general fund, upon information and belief, to ever come close to satisfying its financial obligations hereunder. Therefore, upon settlement Defendants would have to enter into a consent decree (as to not only payment but also as to an injunction, to ensure the flu -- or some similar nonsensical reason other than invasion or rebellion-- is never again allowed to permit an executive to vitiate the constitutional rights and freedoms of the people) or upon trial and entry of judgment, this Court should appoint as special master to effectuate distribution of funds and/or issue Orders, mandating the County raise taxes or sell assets to satisfy the judgment.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants in their favor as follows:

A.  That this Honorable Court certify this Complaint as a class action;

B.  That the Plaintiff and the class members be awarded damages to be determined at trial.

C.  For an emergency, temporary and permanent injunction be issued by this

Court in order to prevent any further irreparable damages to the Plaintiff and the class members.

D.  For costs and expenses to be assessed against the Defendants.

E.  For a jury to be empaneled to hear this cause.

E.  For general relief.

Respectfully submitted,

THE EGLI LAW FIRM

s/Russ Egli
Russ Egli, BPR#024408
The Wisdom Building
11109 Lake Ridge Drive, FL3
Concord, TN 37934
(865) 304-4125
F:(855) 827-0624
E-mail: russelleglilaw@gmail.com

LAW OFFICES OF DARREN V. BERG

s/Darren V. Berg
Darren V. Berg
Lead Counsel
P.O. Box 33113
Knoxville, TN 37933
(865) 773-8799
E-mail: dberglawfirm@gmail.com